# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 15-cr-161 (PAM/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| Brent Michael Sam, | |
| Defendant. | |

_____

## I.   FINDINGS OF FACT & FACTUAL OBJECTIONS

On September 16, 2015, Defendant pleaded guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). As mandated by the Federal Rules of Criminal Procedure, the probation office then submitted a pre-sentence investigation report ("PSI") in this matter. See 18 U.S.C. § 3552; Fed. R. Crim. P. 32(c). The PSI found that early in the morning of December 13, 2014, Sam pointed a gun directly at a man outside of the Grand Casino Mille Lacs and threatened him with it. The PSI increased the offense level by 4, because Sam possessed a firearm in connection with another felony offense under U.S.S.G. § 2K2.1(b)(6)(B). Sam objects to this enhancement, because he contends that there is insufficient evidence to show that he possessed the gun in connection with another felony offense. He adds that he was too intoxicated to remember the offense in its entirety.

Sam's specific objections to the findings of fact are as follows:

a. **Surveillance Video**

Paragraph 7 of the PSI states that a surveillance video shows three men exiting a white Cadillac, then a male exiting the casino and speaking with the three men. Sam was one of the men who stepped out of the Cadillac. The video then shows Sam removing a handgun from somewhere on his person and pointing it at the man who had just exited the casino. Sam objects to any findings based on the video, because the video "is extremely blurry [and] does not clearly or definitively show the defendant or a handgun." (Def.'s Pos. Mem. (Docket No. 63) at 15.)

b. **Police and Security Guard Statements**

Sam also objects to the PSI's findings based on police interviews of four individuals at the casino and a statement the victim made to a casino security guard. Both the police and the security guard reported that Sam pointed the gun directly at the victim, and the security guard added that Sam had threatened the victim with the gun. Sam, having conducted an independent investigation, argues that their testimony is unreliable because police did not properly administer identification procedures.

c. **Witness Interviews**

Sam argues that any findings based on statements of the witnesses themselves in paragraphs 6 and 8 were "botched" because the witnesses were interviewed as a group, and therefore the "potential that these witnesses influenced each other during the interview is high." (Id. at 16.) Sam adds that the witnesses were likely to have been

"prompted with leading questions during the interview," because the witnesses were intoxicated. (Id.)

**d.      State Court Record**

Sam also asserts that the PSI's finding that he used the firearm in connection with another felony offense is not supported by the state court record. Sam argues that the record suggests that Sam only committed a misdemeanor level offense. First, Sam points out, law enforcement testified that "somebody was waving a gun around." (Id. (quoting Hr'g Tr. at 27).) Sam argues that this suggests that, at most, he violated Minn. Stat. § 609.66 subd. 1(1), which prohibits reckless handling or use of a gun. Second, he argues, testimony that "there was a report of a gun that was brandished or pointed at someone at the casino" (id.), could mean a violation of either Minn. Stat. § 609.66, subd. 1(1) or 1(2), which prohibits intentionally pointing a gun at or toward another, and is also a misdemeanor.

**e.      Conclusion**

Sam is not able to argue that he knows exactly what happened that morning outside the casino, because he admits he was too intoxicated to remember the incident. The Court is left with the evidentiary record, which, collectively, shows that at the very least, Sam did brandish the gun, and is therefore subject to an enhancement. However, this enhancement ultimately does not affect Sam's sentence because, as explained below, Sam is subject to a harsher enhancement under the ACCA.

## II.   ACCA ENHANCEMENT

The PSI determined that Sam had three prior violent felony convictions deemed predicate offenses under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), and recommended a 15-year minimum term of imprisonment based on a total offense level of 31. Sam objects to the PSI's total offense level, and asks for a downward departure or variance so that his term of imprisonment is 60 months. According to Sam, none of the three prior convictions in question qualify as a predicate offense for the purposes of an ACCA enhancement. Sam argues that if he is not deemed a career criminal (and if the four-level increase for use of a firearm in connection with another felony offense is not applied), his total offense level would be 21, with a corresponding 77 to 96 months range of imprisonment. By way of context, the Court will provide a synopsis of the facts underlying the three convictions at issue.

### A.   Prior Offense Conduct

In April 2006, when Sam was 17 years old, he and two other juvenile males broke into a house around midnight. According to the charging documents, Sam was carrying a golf club, and the other two were either carrying a golf club or a large wooden stick. A resident of the home, also a juvenile male, had been sleeping inside until Sam and his friends began yelling at him. They rushed at him, hitting him with the objects they were carrying. The victim locked himself in the bathroom, but Sam and the others kicked the door in and began hitting him again. In 2009, Sam pleaded guilty to First Degree Burglary - Assault in Building/On Property. Sam was adjudicated under Minnesota's

Extended Juvenile Jurisdiction ("EJJ"), Minn. Stat. § 260B.130, and received an adult sentence of 48 months' imprisonment.

In March 2013, Sam was charged with domestic assault of his girlfriend, T.D. The criminal complaint states that Sam entered T.D.'s hotel room at the Grand Casino Mile Lacs Hotel and pushed her. T.D. pushed him back out of the room, where he began hitting her. Sam "repeatedly struck [T.D.] in the face and head, including a punch to the nose area that caused her to fall to the ground." (Gov't Pos. Mem. (Docket No. 65), Ex. 2.) Officers reported that T.D.'s nose was "deformed, bleeding, and black and blue," and she was diagnosed with a broken nose. (Id.)

Then in July 2013, Sam broke into T.D.'s mother's home where T.D. was staying at the time. The criminal complaint states that when the first officer arrived at the scene, he or she heard T.D. yelling "stop hurting me!" and heard T.D. screaming "as if in significant pain." (Id., Ex. 1.) The officer then saw Sam repeatedly punch T.D. in the head with closed fists as T.D. covered her head yelling "please stop!" (Id.) Sam punched T.D. a total of "about 8 to 10 times." (Id.) The officer "observed that Sam punched [T.D.] very hard." (Id.) When the officer announced his or herself, Sam "grabbed [T.D.] by her hair, and pulled her down a large hill into [the] woods." (Id.)

**B.   ACCA  Predicate Offense Analysis**

A convicted felon who possesses a firearm is subject to an enhanced, mandatory minimum 15-year sentence if that defendant has three prior convictions for either a violent felony or a serious drug offense. 18 U.S.C. § 924(e)(1). The dispute here centers on the meaning of "violent felony" in the ACCA, which defines the term as either:

5

> (i) a crime that "has as an element the use, attempted use, or threatened use of physical force against the person of another," or
>
> (ii) "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

Id. § 924(e)(2)(B).

To determine whether a state conviction qualifies as a predicate ACCA crime of violence, the Court must examine the elements of the state crime. The ACCA defines a predicate crime of violence as one that "has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). If the statute of conviction is divisible in that it encompasses multiple crimes, some of which are crimes of violence and some of which are not, courts apply a modified categorical approach to "look at the charging document, plea colloquy, and comparable judicial records" for determining which part of the statute the defendant violated. United States v. Dawn, 685 F.3d 790, 794-95 (8th Cir. 2012). Then, the Court must determine whether a violation of that statutory subpart is a crime of violence. See id. at 795. If the state statute is indivisible—if it does not set forth alternative versions—then the Court may only look at the statute itself. Descamps v. United States, 133 S. Ct. 2276 (2013).

Defendant argues that his Minnesota convictions for felony domestic assault, third-degree assault, and burglary do not fit within the ACCA's definition of a crime of violence and that the ACCA's mandatory 15-year minimum cannot therefore be applied to him.

### 1. Felony Domestic Assault Conviction

Sam was convicted of Felony Domestic Assault under Minn. Stat. § 609.2242, which provides:

> Whoever does any of the following against a family or household member as defined in section 518B.01, subdivision 2, commits an assault and is guilty of a misdemeanor:
>
> (1) commits an act with intent to cause fear in another of immediate bodily harm or death; or
>
> (2) intentionally inflicts or attempts to inflict bodily harm upon another.

Minn. Stat. § 609.2242, subd. 1.  Bodily harm is defined as "physical pain or injury, illness, or any impairment of physical condition." Id. § 609.02, subd. 7.

Sam pled guilty to the assault charge, and was convicted of a felony because he violated § 609.2242, subd. 1 "within ten years of the first of any combination of two or more previous qualified domestic violence-related offense convictions." Id. § 609.2242, subd. 2.  Sam argues that because the domestic assault statute is divisible, and because the state court documents don't clearly establish which element clause was the basis for his conviction, the conviction cannot be considered an ACCA predicate offense.  Sam adds that even if he was convicted under § 609.2242, subd. 1(2), the conviction still cannot be counted as an ACCA predicate offense because its language is overbroad.

Here, it appears from the criminal complaint that Sam was convicted under subsection 1, (Gov't Pos. Mem., Ex. 1 ("Sam did unlawfully assault a family or household member by causing fear in the victim of immediate bodily harm or death.")), however, it is irrelevant which subsection applied to his conviction, because under

7

current Eighth Circuit authority, both subsections constitute crimes of violence and therefore the statute is not divisible.

A crime of violence involves a violation that "has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2. "Physical force under the guidelines refers specifically to 'violent force,' meaning 'force capable of causing physical pain or injury to another person." United States v. Rice, No. 14-3615, 2016 WL 537589, at *2 (8th Cir. Feb. 11, 2016). In United States v. Salido-Rosas, the Eighth Circuit examined an Omaha Municipal Code provision that prohibited "plac[ing] another person in fear of imminent bodily harm." 662 F.3d 1254, 1256 (8th Cir. 2011). The court concluded that this offense—that is, the offense of placing another person in fear of imminent bodily harm—was a crime of violence under Section 2L1.2 of the Sentencing Guidelines, which, like the ACCA, defines crime of violence as including any offense that has as an element the use, attempted use, or threatened use of physical force against the person of another. The Eighth Circuit reasoned that "making another person fear imminent bodily harm necessarily requires using, attempting to use, or threatening to use physical force." Id. Both subsections 1 and 2 of Minn. Stat. § 609.2242, subd. 1 involve the threat or use of physical force, because both describe threatening, causing, or attempting to cause bodily harm, and "[i]t is impossible to cause bodily injury without applying force." Rice, 2016 WL 537589, at *2.

Under Salido-Rosas, Sam's second argument—that subsection 2 of the domestic assault statute is overbroad—fails as well. Salido-Rosas argued that the Nebraska statute, which criminalized conduct causing or attempting to cause "bodily injury" or making

8

someone fear "imminent bodily harm," was over-inclusive because it criminalized conduct that could include, for example, mere offensive touching. Salido-Rosas, 662 F.3d at 1256-57. The Eighth Circuit disagreed, finding that statutory references to "bodily injury" and "bodily harm" bring that statute "squarely within [the ACCA's] definition of offenses involving physical force." Id. at 1257.

### 2. Third-Degree Assault Conviction

Sam was convicted of Assault in the Third Degree under Minn. Stat. § 609.223, which prohibits "assault[ing] another and inflict[ing] substantial bodily harm." Sam objects to the classification of this conviction as a predicate offense because the statute includes recklessness as a mens rea, and, he argues, is therefore overbroad.

Minnesota law defines assault as "(1) an act done with intent to cause fear in another of immediate bodily harm or death; or (2) the intentional infliction of or attempt to inflict bodily harm upon another." Minn. Stat. § 609.02, subd. 10. Substantial bodily harm means "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily member or organ, or which causes a fracture of any bodily member." Id., subd. 11.

Sam contends that a crime that imposes strict liability and can be satisfied by negligence or recklessness falls outside the scope of the ACCA's violent felony definition. The level of intent is not pertinent to this analysis. Under the authority discussed in the previous section, a third-degree assault conviction is undoubtedly a "violent felony" under the meaning of the ACCA, because it "has as an element the use, attempted use, or threatened use of physical force against another." See, e.g., Hirman v.

9

United States, 613 F.3d 773 (8th Cir. 2010) (rejecting defendant's argument that because his felony conviction under Minn. Stat. § 609.223 was retroactively downgraded to a misdemeanor, he should not be considered a career criminal).

### 3. Burglary Conviction

Sam was convicted of first-degree burglary under Minn. Stat. § 609.582, which provides:

> Whoever enters a building without consent and with intent to commit a crime, or enters a building without consent and commits a crime while in the building, either directly or as an accomplice, commits burglary in the first degree . . . if:
>
> (a) the building is a dwelling and another person, not an accomplice, is present in it when the burglar enters or at any time while the burglar is in the building;
>
> (b) the burglar possesses, when entering or at any time while in the building, any of the following: a dangerous weapon, any article used or fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon, or an explosive; or
>
> (c) the burglar assaults a person within the building or on the building's appurtenant property.

Minn. Stat. § 609.582, subd. 1. Sam asserts that his burglary conviction should not be used as an ACCA predicate offense to enhance his sentence because § 609.582 only requires a person enter a building "without consent" and not by "unlawful entry," and therefore does not meet the generic definition of burglary.

The burglary of a dwelling is specifically included in the language of the sentencing guidelines as a "crime of violence." See U.S.S.G. § 4B1.2(a)(2) (defining "crime of violence" as "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that . . . is burglary of a dwelling"); see also

United States v. Mohamed, 623 F. App'x 839, 840 (8th Cir. 2015) (affirming enhanced sentence based in part on predicate § 609.582, subd. 1(c) offense).

Sam also argues that the burglary adjudication should not be used as a predicate offense because he committed this offense when he was a juvenile. He cites no authority that directly supports his contention, rather he provides only policy arguments. He asserts that there is a growing concern with excessive punishments for juvenile offenses, and asks the Court to recognize the evolving standards of decency to determine that the ACCA's mandatory minimum as applied to Sam's EJJ conviction is "disproportionate and cruel and unusual." (Def.'s Pos. Mem. at 13.)

Unfortunately for Sam, Eighth Circuit precedent directs the Court to deem his juvenile burglary adjudication a predicate offense for the purposes of the ACCA enhancement. In United States v. Nash, the Eighth Circuit found that an EJJ adjudication is an adult conviction and therefore a predicate offense under the ACCA. 627 F.3d 693 (8th Cir. 2010).

## C. Conclusion

Sam has not established that any of the three felony convictions at issue fall outside the category of ACCA predicate offenses. The Court recognizes that Sam is a young Native American man who has inherited the struggles of his community and family. However, "[a] defendant who is subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e) is an armed career criminal." U.S.S.G. § 4B1.4. Federal law dictates that Sam be sentenced as a career criminal and receive the corresponding mandatory minimum term of imprisonment.

Having made these findings, the Court determines that the applicable guidelines are:

>Total Offense Level: 31
>Criminal History Category: VI
>Imprisonment Range: 188 months – 235 months
>Supervised Release Range: 2 - 5 years
>Fine Range: $15,000 to $150,000

### III.   SENTENCE

180 months' imprisonment.  Supervised release term of 5 years.  No fine.  $100 special assessment to the Crime Victims Fund.

### IV.   STATEMENT OF REASONS

As explained at the sentencing hearing and more fully below, the Court finds that the sentence imposed is reasonable and in accord with the factors enunciated in 18 U.S.C. § 3553.  See Gall v. United States, 552 U.S. 38, 49-50 (2007); United States v. Booker, 543 U.S. 220, 261-65 (2005).  Specifically, the Court finds that the sentence considers the history and characteristics of Defendant and reflects the seriousness of the offense, promotes respect for the law, affords adequate deterrence, and provides just punishment and public protection.

#### A.   Determining Reasonableness of a Sentence

As a "starting point" in determining the reasonableness of a sentence, the Court begins by calculating the applicable guidelines range.  Gall, 552 U.S. at 49.  The Court is required to give "both parties an opportunity to argue for whatever sentence they deem appropriate."  Id.  The Court then considers the § 3553(a) factors to determine whether they support the sentence requested by a party.  Id.  The Court "may not presume that the

Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." Id. at 50. When the Court determines that a sentence above or below the guidelines range is warranted, the Court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. at 50.

**B.     Defendant's Sentence**

Based on the facts set forth in the PSI and the discussion above, the Court has determined the appropriate guidelines sentence. (See Part III.) The Court finds that a sentence of the statutory mandatory minimum, which is just below the applicable guidelines range, is appropriate in light of the factors in 18 U.S.C. § 3553. In particular, the Court finds that a sentence of 180 months is sufficient punishment in this case in light of all the factors discussed previously.

Defendant moved for a variance from the Guidelines. Although the Court has not given Defendant the entire variance he requested, the Court has varied from the guidelines, and thus Defendant's motion (Docket No. 62) is granted in part.

This sentence takes into consideration the nature and circumstances of the offense; the history and characteristics of Defendant; the need to reflect the seriousness of the offense; promote respect for the law, and provide just punishment; the need to afford adequate deterrence and to protect the public; and the need to provide restitution to victims of the offense. See 18 U.S.C. § 3553(a)(1)-(7).

Defendant must report to the U.S. Probation and Pretrial Services Office in the district to which Defendant is released within 72 hours of release from the custody of the

Bureau of Prisons. While on supervised release, Defendant shall abide by the standard conditions recommended by the Sentencing Commission. He shall not commit any federal, state, or local crimes. In addition, Defendant shall refrain from possessing a firearm, ammunition, destructive device, or other dangerous weapon.

Defendant shall not illegally possess a controlled substance. Defendant shall refrain from any unlawful use of a controlled substance. Defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the Court pursuant to 18 U.S.C. §§ 3563(a) and 3583(d).

Defendant shall cooperate in the collection of DNA as directed by the probation officer and mandated by 18 U.S.C. §§ 3563(a) and 3583(d). Defendant shall abstain from the use of alcohol and other intoxicants and shall not frequent establishments whose primary business is the sale of alcoholic beverages.

In addition to standard conditions of supervised release, Defendant shall complete an immediate assessment or participate in a program for substance abuse as approved by the probation officer upon release or relapse during the term of supervised release. That program may include testing and inpatient or outpatient treatment, counseling, or a support group. Further, Defendant shall contribute to the costs of such treatment as determined by the Probation Office Co-Payment Program, not to exceed the total cost of treatment.

If not employed at a regular lawful occupation, as deemed appropriate by the probation officer, Defendant may be required to perform up to 20 hours of community service per week until employed. Defendant may also participate in training, counseling,

daily job search, or other employment-related activities, as directed by the probation officer.

Defendant shall pay a special assessment of $100. Because of Defendant's inability to pay, the Court does not order Defendant to pay a fine or costs of imprisonment or supervision.

Finally, the Court recommends that the Bureau of Prisons place Defendant in the Federal Correctional Institution in Sandstone, Minnesota, so that he may be close to his family. The Court also recommends that Defendant be allowed to participate in the 500-hour drug treatment program during the period of his incarceration.

Dated:  March 17, 2016

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge
